# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>100 F Street, N.E.<br>Washington, D.C.  20549,<br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br><br>JOHN A. FOLEY,<br>855 Alameda Avenue<br>Denver, CO  80209,<br><br>AARON M. GRASSIAN,<br>7655 N FM 620<br>Austin, TX  78726,<br><br>TIMOTHY L. VERNIER,<br>11 Morningside Drive<br>Wheat Ridge, CO  80215, and<br><br>BRADLEY S. HALE,<br>104 Longwood Cove<br>Austin, TX  78734,<br><div align="right">Defendants.</div> | **COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges that:

## SUMMARY OF THE ACTION

1.     This case involves a pattern of insider trading and tipping over a 22-month period among a group of close friends and associates. Between July 2005 and May 2007, Defendant John A. Foley served as an employee benefits specialist at Deloitte Tax LLP, where he worked on client engagements for three of the four public companies whose securities were the subject of the insider trades. Foley's friend, Defendant Aaron M. Grassian, is a former employee of the

fourth public company. The four public companies involved are Crocs, Inc., YRC Worldwide, Inc., Spectralink Corporation and SigmaTel, Inc.

2. On four occasions between April 2006 and February 2008, Foley knowingly or recklessly traded on, and dispensed tips of, or recommendations based on, material, non-public information to various of the other defendants and others, who traded on Foley's communications, in violation of the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and, on one of those occasions, in violation of Section 14(e) of the Exchange Act as well. On the first three of these occasions, Foley acted in breach of his duties to Deloitte and its clients. On the fourth occasion, Grassian reciprocated by, in turn, tipping Foley concerning the acquisition of SigmaTel by Freescale Semiconductor, Inc., after knowingly or recklessly learning of that pending acquisition from his friend and former colleague, Defendant Bradley S. Hale. Hale, who worked on the acquisition for Freescale, also gave Grassian frequent updates as the talks progressed, all in breach of Hale's fiduciary duties to Freescale. Grassian traded on Hale's tips for himself and passed them on to Foley, who, in turn, both traded in SigmaTel for himself, and also tipped Defendant Timothy L. Vernier and recommended SigmaTel to others, who likewise traded. In all, the trading by Foley, Grassian, Vernier and others whose trading stemmed directly or indirectly from Foley's and Hale's breaches of duty, yielded illegal profits totaling $210,580.62

3. At the time of the foregoing trading and tipping, Foley, Hale, and each of their respective direct and indirect tippees knew, or recklessly disregarded the fact, that Foley's and Hale's tipping breached their respective duties to their employers, as well as Foley's further duties to his employer's clients. By their conduct, each of the defendants violated Section 10(b)

of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

and they will continue to do so unless restrained or enjoined by this Court. Defendants Foley,

Grassian and Vernier also violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)]  and

Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3]; and they will continue to do so unless restrained

or enjoined by this Court.

4.      Finally, because Crocs was a Deloitte audit client and Foley served on the Crocs

audit team at the time of his Crocs trading and tipping, Foley also directly violated, and aided and

abetted and caused Deloitte's violation of, Rule 2-02(b) of Regulation S-X [17 C.F.R. § 210.2-

02(b)], and aided and abetted and caused Crocs' violations of Exchange Act Section 13(a) [15

U.S.C. § 78m(a)] and Rule 13a-13 thereunder [17 C.F.R. § 240.13a-13]; and he will continue to

do so unless restrained or enjoined by this Court.

5.      The Commission seeks permanent injunctions enjoining the defendants from

future violations of the applicable federal securities laws and rules, disgorgement of their

unlawful trading profits with prejudgment interest, civil monetary penalties, and any additional

relief that the Court deems appropriate.

## JURISDICTION

6.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A

and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  In connection with

the conduct described herein, the defendants, directly or indirectly, made use of the means and

instrumentalities of interstate commerce, or of the mails, or of the facilities of a national

securities exchange.

## THE DEFENDANTS

7.     John A. Foley, age 34, resides in Denver, Colorado.  During the relevant period,

Foley worked at Deloitte as an employee benefits manager.

8.     Bradley S. Hale, age 46, resides in Austin, Texas.  During the relevant period,

Hale worked for Freescale as Director of Product Management.

9.     Aaron M. Grassian, age 34, resides in Austin, Texas, and is a friend of Foley's

and Hale's.  Grassian had worked at SigmaTel until sixteen months before Hale's SigmaTel

tipping commenced, and had been a co-worker of Hale's at SigmaTel and at another public

company.  Grassian was neither employed by nor working with any of the entities identified in

this Complaint, however, at the time of the conduct described herein.

10.    Timothy L. Vernier, age 41, resides in Wheat Ridge, Colorado, and is a friend of

Foley.

## THE PUBLIC COMPANIES

11.    Crocs, Inc. ("Crocs") is a Delaware corporation headquartered in Niwot,

Colorado, that designs, manufactures and markets footwear.  Crocs' common stock has, since

July 2006, been registered with the Commission pursuant to Section 12(b) of the Exchange Act

(but was originally registered pursuant to Exchange Act Section 12(g)), and quoted on the

Nasdaq Global Market, under the ticker symbol CROX.  Crocs made its initial public offering on

February 8, 2006 and, as of February 28, 2006, had 38,272,247 shares of common stock

outstanding.  Deloitte & Touche LLP has been Crocs' independent auditor since at least 2004.

12.    YRC Worldwide Inc. ("YRC") is a Delaware corporation headquartered in

Overland Park, Kansas, that is one of the world's largest transportation service providers.  YRC's

4

common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act, and quoted on the Nasdaq Global Market, under the ticker symbol YRCW.  As of October 31, 2006, YRC had 57,120,386 shares of common stock outstanding.

13.     Spectralink Corporation ("Spectralink") is a Delaware corporation headquartered in Boulder, Colorado, that designs, manufactures and sells workplace wireless telephone systems. Prior to consummation of its merger with Polycom, Inc., Spectralink's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act, and quoted on the Nasdaq Global Market, under the ticker symbol SLNK.  As of February 28, 2007, the record date of its merger with Polycom, Spectralink had 19,577,198 shares outstanding.  This merger was effected through a tender offer; Spectralink filed with the Commission a Schedule TO (which it identified as an "SC TO-C") on February 7, 2007.

14.     SigmaTel, Inc. ("SigmaTel"), a semiconductor company, is a Delaware corporation headquartered in Austin, Texas.  Prior to consummation of its merger with Freescale Semiconductor, Inc., SigmaTel's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act, and quoted on the Nasdaq Global Market, under the ticker symbol SGTL.  As of March 6, 2008, the record date of its merger with Freescale, SigmaTel had 36,282,375 shares outstanding.

## FACTS

### The Defendants' Duties

15.     At the time of the tipping and trading detailed herein, Defendants Foley and Hale knew or recklessly disregarded the duties that they, by their conduct, breached; and Defendants Grassian and Vernier knew of, or recklessly disregarded, Foley's and Hale's breaches of duty.

5

16.     For his part, Foley had committed in writing, before starting work at Deloitte, not to use for any purpose other than for the benefit of the firm or its clients, or to disclose to anyone outside the firm, any "proprietary information," defined to include information learned in the course of client engagements.  Foley was likewise informed in writing—in Deloitte's letter offering him employment at the firm—that pursuant to the firm's auditor independence policies, he would, upon joining the firm (i) be prohibited from holding or trading any securities of any firm audit clients for which he worked; and (ii) be required to maintain, in the firm's independence tracking system, a current list of his securities accounts and interests.  Foley affirmed each year that he was in compliance with the forgoing policies of the firm, and that the information he had supplied to the firm's independence tracking system "accurately and completely" embraced all securities and brokerage accounts he beneficially owned.  Foley never disclosed to Deloitte, however, his beneficial ownership of the accounts in others' names through which he conducted the trading that is detailed below.

17.     For his part, as a participant in the Freescale-SigmaTel acquisition talks, Hale signed a confidentiality agreement concerning those talks, specifically requiring him to refrain from making disclosures concerning them.  Moreover, Grassian and Hale each had many years' experience working for public companies having insider trading policies, and were both familiar, through that experience, with the prohibitions on insider trading and tipping.  Finally, through their past experience working as stockbrokers, Vernier and Hale both knew or recklessly disregarded the prohibitions on insider trading and tipping, while Vernier also knew or recklessly disregarded that brokerage firms required all persons exercising trading authority over accounts to be identified in the accounts' documentation.

6

**Foley Trades Through Accounts in Others' Names**

18.     Foley conducted his illegal trading based on Deloitte client information in two

different nominee accounts at a discount brokerage firm.  Beginning in May 2006, Foley

conducted this illegal trading through an account in the name of Defendant Vernier (the "Vernier

Account")—trading in which Vernier joined by contributing some of his own funds; then, by

November 2006, Foley shifted to an account in another person's name (the "Nominee Account"),

and used that account to trade on Deloitte client information until February 2007.  After leaving

Deloitte, Foley also used the Nominee Account to conduct illegal insider trading in SigmaTel in

early 2008, trading for which he also used accounts in his own name.

19.     Although Foley's name did not appear on the Vernier Account or the Nominee

Account, Foley maintained a beneficial interest in the former account for several months during

2006, and in the latter account from November 2006 until early 2008.  Foley supplied the funds

to open both accounts; and he continued to fund the Nominee Account throughout the relevant

period.  Foley accessed and conducted trading in both accounts; and Foley reaped that trading's

proceeds—taking care, at every step, to conceal his participation.


**Foley Trades on Information He Learns From Deloitte Clients
And Tips Others, Who Likewise Trade**

20.     On three separate occasions during his tenure at Deloitte, and with respect to three

different public companies—Crocs, YRC and Spectralink—Foley used the Vernier Account, the

Nominee Account, or both, to trade on material, non-public information that he learned in the

course of Deloitte client engagements, and tipped others, who likewise traded.

7

**Crocs' First Earnings Release After Going Public**

21.     On Thursday, May 4, 2006, after the markets closed, Crocs issued its first

earnings release since going public three months earlier. In that release, Crocs announced

stronger than expected fiscal 2006 first quarter financial results, with earnings of 20¢ per share—

which exceeded analysts' consensus estimates by 6¢ per share, or 42.8%. On the very next

trading day, Friday, May 5, 2006, Crocs' share price opened at $35.73, up $3.38—or 10.44%—

from its previous day's close of $32.35. Crocs' share price continued to climb after the market

opened, reaching a high of $37—up $4.65, or 14.37%, from its previous day's close—before

retreating, in the wake of other developments, to close at $31.85 on more than ten times its

average daily trading volume.

22.     During the weeks leading up to Crocs' May 4, 2006 earnings release, Foley

participated in a Deloitte tax engagement for Crocs. That engagement consisted of a review of

Crocs' "tax provision"—consisting of certain line items on Crocs' financial statements—in

support of Deloitte auditors' quarterly reviews for Crocs' first fiscal quarter ended March 31,

2006. As Employee Benefits Manager at Deloitte's Denver office, Foley was responsible for

verifying a component of Crocs' tax provision, namely, the tax effects of compensatory stock

options that Crocs had issued. In order to do this work, which had to be completed prior to the

issuance of Crocs' earnings release, Foley needed—and was, by April 25, 2006, provided with—

Crocs' latest earnings-per-share ("EPS") calculations.

23.     On that same day, Tuesday, April 25, 2006, Foley began trading in Crocs listed

call options through the Vernier Account. Over the next eight trading days, during which he was

in frequent telephone contact with Vernier, Foley continued buying Crocs listed call options,

often accessing the Vernier Account from Deloitte's offices to do so.  In all, the Vernier Account

purchased a total of 124 Crocs listed call options during this period, all due to expire less than a

month later.  Most of these options were out-of-the-money at the time they were purchased, the

majority by over $3 per share, and were therefore dependent upon a significant near-term rise in

Crocs' share price in order to be profitable.  The total cost of these options was $15,290—$5,000

of which was contributed by Foley, with the remainder consisting of a loan from Vernier to Foley

as well as Vernier's own investment.

24.     Foley's friend Grassian also traded in Crocs listed call options during this period,

purchasing the same series of Crocs call options that Foley and Vernier purchased through the

Vernier Account.  Those purchases by Grassian—on April 27 and May 2, 2006—shortly

followed the conclusion of telephone conversations between Foley and Grassian.  During these

conversations, Foley, at a minimum, recommended Crocs options trading to Grassian, who then

traded based on Foley's communications.

25.     Following the May 4, 2006 announcement of Crocs' first quarter earnings, the

illegal Crocs profits flowing from Foley's and Vernier's Crocs trading in the Vernier Account

and Foley's communications with Grassian totaled $16,614.43.

### The Potential Acquisition of YRC

26.     By October 26, 2006, YRC had engaged Deloitte to perform tax work relating to

the potential acquisition of YRC by a third party, and Foley was assigned to work on this

engagement.  This tax work consisted of calculating the tax effects, under Section 280G of the

Internal Revenue Code, of the executive compensation components of the potential acquisition,

including analysis of the cost—in cash and stock—of payments to executives having severance

9

or other employment agreements triggered by a change in control. (Under the Internal Revenue Code, "parachute payments" triggered by a change in control are subject to a federal excise tax and cannot be deducted as a business expense; see 26 U.S.C. §§ 280G & 4999.) To do this work (hereinafter referred to as "280G work"), Foley and his colleagues on the engagement had to know, and were in fact made privy to, highly material and non-public information that included not only the fact that YRC was the target of acquisition talks, but also details concerning the acquisition's anticipated timing and pricing.

27.     Thereafter, Foley and Vernier knowingly or recklessly traded on this material, non-public information. On Friday, October 26, 2006, Foley placed a 5-minute telephone call to Vernier. Less than an hour later, and despite never before having traded in YRC securities, Vernier bought 30 out-of-the-money YRC call option contracts. The strike price and expiration dates of these options positioned them to yield significant profits in the event that the acquisition of YRC were to be consummated in accord with the anticipated timing and pricing details that Foley then possessed.

28.     On four separate occasions over the next two months, as the YRC acquisition talks stalled, rekindled, and stalled again, Foley (using the Nominee Account) and Vernier (after receiving updating tips from Foley) purchased and sold out-of-the-money YRC call options. All of their YRC options purchases during this time were positioned, based on the options' strike prices and expiration dates, to yield significant profits based on the material, non-public price and timing details Foley then possessed about the highly confidential YRC acquisition talks. Ultimately, however, as no acquisition of YRC was consummated, no illegal profits resulted from Foley's and Vernier's YRC call options trading.

### The Acquisition of Spectralink

29.     On Wednesday, February 7, 2007, after the markets closed, Spectralink and Polycom, Inc. jointly announced that Polycom would acquire all of Spectralink's outstanding common stock through a tender offer priced at $11.75 per share. The announced acquisition price represented a 33.4% premium over Spectralink's $8.81 closing price of earlier that day. The following day—Thursday, February 8, 2007—Spectralink's share price opened at a high of $11.66, up $2.85, or 32.3%, from its previous day's close, before climbing to an intra-day high of $11.73 and then closing at its $11.66 opening price on more than sixty-nine times its average daily trading volume.

30.     By January 17, 2007, Spectralink had engaged Deloitte to perform 280G work on the potential acquisition of Spectralink; Deloitte and Spectralink had applied a code name—"Project Spyglass"—to the engagement; and Foley was working on the engagement. By January 29, 2007, Foley had learned that Spectralink expected the acquisition to be announced on February 7, 2007, and expected the acquisition's price-per-share to be $11.75.

31.     On Monday, January 29, 2007, the same day Foley learned the foregoing material, non-public information, Foley accessed the Nominee Account from Deloitte's offices and began purchasing Spectralink call options. Over the next several trading days, Foley purchased a total of 540 Spectralink call options of two different series—all of which were out-of-the-money and set to expire in the near term. On four of the five trading days in question—January 29, 30, 31 and February 1—these purchases by Foley alone comprised fully 100% of the customer volume in the respective options series; and on the fifth trading day—February 2nd—Foley's purchases

alone comprised 80% of the customer volume in one series and 43.47% of the customer volume in the other.

32.    Foley also tipped his friends Grassian and Vernier concerning the Spectralink acquisition, and both traded. With respect to Grassian, Foley conveyed his Spectralink tip during a 16-minute call he placed to Grassian on February 6, 2007. During that call, Grassian logged in to his own brokerage account and purchased 150 out-of-the-money Spectralink call options, all set to expire in the near term, using market orders to do so. These purchases by Grassian alone comprised fully 100% of that day's customer volume in the options series he purchased. With respect to Vernier, Foley's tips were conveyed to Vernier in phone calls, in-person contacts, or both, prior to Vernier's purchases—on January 30th, February 2nd and February 6th, 2007—of Spectralink common stock; these purchases totaled 3,200 shares.

33.    Following the announcement of the acquisition of Spectralink, the illegal Spectralink profits flowing from Foley's trading and tipping totaled $109,173.94, consisting of $77,282.38 from Foley's own trading in the Nominee Account, $21,285.27 from Grassian's trading, and $10,606.29 from Vernier's trading.

### Grassian Reciprocates by Passing on Hale's SigmaTel Tips to Foley (Tips on Which Grassian also Traded for Himself); Foley Trades and Tips Others, Who Likewise Trade

34.    By early November 2007, Freescale began highly confidential merger discussions with SigmaTel that ultimately led to the February 4, 2008 announcement that SigmaTel had agreed to be acquired by Freescale. As these highly confidential talks progressed, an inside participant in those talks on the Freescale side—Grassian's friend, former co-worker, and fellow Austin, Texas resident Brad Hale—repeatedly tipped Grassian concerning the talks'

12

developments; Grassian traded on Hale's tips; and Grassian passed on Hale's tips to Foley, who

likewise traded, and who tipped others, who traded as well.

35. On November 9, 2007, for example, shortly after learning that SigmaTel had

responded receptively to Freescale's acquisition talks overture, Hale called Grassian and spoke to

him for thirteen minutes. Shortly after the market opened on the very next trading day following

this conversation—Monday, November 12, 2007—Grassian bought 2,250 shares of SigmaTel's

common stock.

36. Then, on January 7, 2008, by which time the Freescale-SigmaTel talks had

progressed into the due diligence phase, the parties had set up a secure Internet "data room" to

share due diligence materials, and Hale used it, Hale placed another call to Grassian, this one

lasting nine minutes. Less than ten minutes after this call concluded, Grassian bought 2,500

more shares of SigmaTel common stock. On ensuing days, despite never having traded in

SigmaTel listed options before, Grassian purchased SigmaTel listed call options, accumulating,

by January 14, 2008, 410 out-of-the-money call options, all of which were set to expire in the

near term.

37. Then, on January 15, 2008, after learning that the parties planned to announce the

acquisition on January 22nd, Hale again contacted Grassian by phone. The next day, Grassian

bought 90 more of the same series of SigmaTel out-of-the-money call options. Finally, on

Friday, February 1st, after learning that the talks (which had in the meantime encountered, then

cleared, an impasse) would result in an announcement the following Monday—February 4,

2008—Hale again contacted Grassian by phone. Within minutes after communicating with Hale,

Grassian bought 250 more of the same series of SigmaTel out-of-the-money call options. Thus,

by the date of the announcement, Grassian had accumulated 750 SigmaTel out-of-the-money calls—all of which were set to expire in the near term—and had done so in trading that alone comprised nearly 92% of the volume in the option series in question over the period Grassian purchased them.

38.     Grassian did not keep Hale's tips to himself, however, but instead shared them with his friend Foley beginning January 7, 2008, thereby reciprocating Foley's prior Spectralink tip. Foley both traded on Grassian's tips and passed them along to others, who likewise traded.

39.     For example, on January 7, 2008, less than twenty minutes after completing his own SigmaTel stock purchase that day, Grassian spoke to Foley in a phone conversation lasting seven minutes. Later that same day, Foley bought 1,000 shares of SigmaTel common stock in his IRA account. The next day, January 8, 2008, Foley bought 3,000 more shares of SigmaTel common stock and also sold 47 January 2009 $2.50 SigmaTel put options—a bullish transaction that alone accounted for fully 100% of the volume in that option series that day.

40.     Then, on January 8th—the day after Foley had both spoken to Grassian and begun trading in SigmaTel securities—Foley phoned Vernier who, in turn, quickly began trading in SigmaTel by buying 1,000 shares of SigmaTel in each of two different accounts, one of which was in his wife's name, for a total investment of 2,000 shares. For his part, Foley continued trading in SigmaTel in his own, as well as the Nominee Account over the next two days, buying, in the Nominee Account, 2,000 SigmaTel shares on January 8th and 1,000 more on January 9th; selling 50 January 2010 $2.50 SigmaTel put options in the Nominee Account on January 9th, and buying 1,000 SigmaTel shares in his own account on January 9th.

14

41.    Then, on the evening of January 15th—after having three communications with Hale, who at the time knew SigmaTel and Freescale expected to announce the SigmaTel acquisition on January 22nd—Grassian had two phone conversations with Foley totaling 22 minutes. Like Grassian, Foley reacted by increasing his SigmaTel position at his next opportunity, by, in his case, on the following day buying 1,700 more shares of SigmaTel, selling 90 SigmaTel January 2009 $2.50 puts, and selling 10 SigmaTel January 2010 $2.50 puts. Like all Foley's prior sales of SigmaTel puts, these trades alone accounted for fully 100% of the customer volume in the options series in question on the dates of Foley's trading.

42.    By January 16, 2008, Foley passed on to Vernier the tip that the SigmaTel acquisition was expected to be announced on January 22nd, doing so either in person, by phone, or both, including a phone call that was quickly followed by Vernier's purchase of 9,000 shares of SigmaTel common stock. On that same date, Foley also recommended SigmaTel to a friend, who, in response, purchased 5,000 shares of SigmaTel common stock.

43.    On ensuing days, Foley and Vernier continued to trade based on the tips of material, non-public information originating from Hale, with Foley buying 1,170 more, and Vernier 5,000 more, shares of SigmaTel on January 17th; and with Foley selling 80 more, and Vernier selling 100, SigmaTel January 2009 $2.50 put contracts that same day—in trading that, again, comprised fully 100% of this options series' daily volume. For his part, Vernier also bought another 5,000 shares of SigmaTel on the following day, Friday, January 18th.

44.    Then, on January 21, 2008, Freescale called off its talks with SigmaTel. Hale learned about this development contemporaneously and called Grassian to pass it on to him.

Grassian then called Foley, passing on this development to him; and Foley, in turn, passed it on to Vernier.

45.     Hale soon learned, however, that the talks remained viable, and so informed Grassian by late on the evening of January 22nd. Because Foley was on a business trip in Europe at the time, however, Grassian was not able to pass this update on to Foley until after U.S. trading markets closed on January 23rd, and Foley was able to pass it on to Vernier only thereafter.

46.     Meanwhile, Vernier had reacted to the inside information that the talks had been called off by selling off, at a loss, a substantial portion of his SigmaTel position—selling a total of 15,000 SigmaTel shares, or more than 71% of his position, on January 22nd and January 23rd. For his part, Foley had sold 1,170 SigmaTel shares, also at a loss, in the Nominee Account before learning that the talks were back on.

47.     After learning that the talks were back on track, Vernier quickly increased his SigmaTel holdings, buying 11,300 shares on January 24th. Vernier also recommended SigmaTel to a friend, in communications that led to further purchases of SigmaTel common stock.

48.     On Monday, February 4, 2008, SigmaTel announced that it had agreed to be acquired by Freescale for $3 per share in cash, representing a 68% premium to its previous trading day's close of $1.79. SigmaTel's share price rose $1.15—or 64%—above its previous trading day's closing price to close at $2.94 on heavy volume. The illegal profits flowing from Hale's illegal SigmaTel tips totaled $84,792.25, consisting of $13,471.66 from Grassian's trading, $39,147.75 from Foley's own trading and from his communications to persons other than Vernier, and $32,172.84 from Vernier's own trading and recommendations.

16

## FIRST CLAIM FOR RELIEF
### Defendants Foley, Hale, Grassian and Vernier
### (Violations of Exchange Act Section 10(b) and Rule 10b-5)

49.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 48 above.

50.     Defendant Foley knowingly or recklessly misappropriated material, non-public information from Deloitte and its clients Crocs, YRC and Spectralink, in breach of his duties to Deloitte and to those clients, and used that information to trade and to make the tips and recommendations detailed above to his friends Vernier and Grassian, each of whom subsequently purchased securities of Crocs, YRC, and/or Spectralink while in possession of the respective material, non-public information that Foley conveyed.

51.     Defendant Foley knowingly or recklessly tipped Vernier concerning the Crocs earnings release and the YRC and Spectralink acquisition talks, tipped Grassian concerning the Spectralink acquisition talks, and recommended Crocs trading to Grassian, intending that Vernier and Grassian would trade on the material, non-public information Foley then possessed about these companies.  In tipping Vernier and Grassian, Foley acted for the purpose of obtaining personal benefits, including, without limitation, reputational enhancement as a source of stock tips, gratitude for being the cause of trading profits, and the ability to confer "gifts" of trading profits on his friends.

52.     Defendants Vernier and Grassian knew, or recklessly disregarded the fact, that the information each received from Foley was material, non-public information that Foley had misappropriated from Deloitte and its clients, in breach of Foley's duties to them, and they traded while in possession of that information.

53.    Defendant Hale knowingly or recklessly misappropriated material, non-public information from Freescale about the planned acquisition of SigmaTel, in breach of his duties to Freescale, and used that information to tip his friend Grassian, who subsequently purchased SigmaTel securities while in possession of that information.  In making these tips to Grassian, Hale acted for the purpose of obtaining personal benefits, including, without limitation, reputational enhancement as a source of stock tips, gratitude for being the cause of trading profits, and the ability to confer "gifts" of trading profits on his friend Grassian.

54.    Defendant Grassian knew, or recklessly disregarded the fact, that the information he received from Hale concerning the SigmaTel acquisition was material, non-public information that Hale had misappropriated from Freescale, in breach of Hale's duties to Freescale; and Grassian traded in SigmaTel securities while in possession of that information.

55.    Defendant Grassian knowingly or recklessly passed on Hale's tips of material, non-public information concerning the SigmaTel acquisition to Foley.  In making these tips to Foley, Grassian acted for the purpose of obtaining personal benefits, including, without limitation, reputational enhancement as a source of stock tips, gratitude for being the cause of trading profits, the ability to confer "gifts" of trading profits on his friend Foley, and reciprocating Foley's prior Spectralink tip to him.

56.    Defendants Foley and Vernier knew, or recklessly disregarded the fact, that the information concerning the SigmaTel acquisition that each received, directly or indirectly from Grassian, was material, non-public information that had been disclosed to Grassian in breach of duty to the information's source.  Foley and Vernier then knowingly or recklessly traded in

SigmaTel securities, and recommended SigmaTel securities trading to others, while in possession

of this material, non-public information.

57.     As a result, between April 2006 and February 2008 (for defendants Foley and

Vernier), between February 2007 and February 2008 (for defendant Grassian), and between

November 2007 and February 2008 (for defendant Hale), Defendants Foley, Vernier, Grassian

and Hale, directly or indirectly, in connection with trades in common stock and options, by use of

the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a

national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) made

untrue statements of material facts, or omitted to state material facts necessary in order to make the

statements made, in light of the circumstances in which they were made, not misleading; or (3)

engaged in acts, practices or transactions which operated as a fraud or deceit upon purchasers or

sellers of securities or upon other persons, in connection with the purchase or sale of securities.

58.     As part of the violative conduct, defendants Foley, Grassian and Vernier, while in

possession of material, non-public information, and under circumstances in which they knew or

should have known that the information was confidential and had been obtained through

misappropriation, a breach of fiduciary duty or other relationship of trust and confidence, or other

wrongful acts, purchased, sold, or caused the purchase or sale, of the relevant securities.

Defendants Foley, Grassian and Vernier, while under a legal duty to either disclose or abstain from

trading, did not disclose the material, non-public information they possessed to those on the

opposite side of the securities transactions in which they engaged.

59.     By reason of the foregoing acts, practices, and transactions, defendants Foley,

Grassian, Vernier and Hale violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and

Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
### Defendants Foley, Grassian and Vernier
### (Violations of Exchange Act Section 14(e) and Rule 14e-3)

60.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 59

above.

61.     By January 29, 2007, Polycom, the acquirer, had taken substantial steps to

commence a tender offer for the securities of Spectralink, including among other things:  (1)

entering into a confidentiality agreement; (2) delivering a proposal to acquire all of Spectralink's

outstanding shares; (3) offering to increase its proposed acquisition price; (4) agreeing to move

forward with the transaction based on Polycom's indication of an all-cash tender offer for

Spectralink at a higher price; and (5) conducting due diligence.

62.     Defendant Foley knowingly or recklessly misappropriated material, non-public

information about Polycom's planned acquisition of Spectralink in breach of his duties to

Deloitte and its client, Spectralink, and used that information to trade in Spectralink securities

and to tip defendants Grassian and Vernier, with whom he had friendships.  Foley's tips were the

cause of Grassian's and Vernier's trading in Spectralink securities.

63.     At the time Grassian and Vernier purchased Spectralink securities, each knew or

should have known that the information obtained from Foley was non-public and that it came

20

either directly or indirectly from the offeror, the target, or any officer, director, partner or employee or any other person acting on behalf of the offeror or target.

64.     By reason of the foregoing acts, practices, and transactions, defendants Foley, Grassian and Vernier violated Section 14(e) of the Exchange Act [15 U.S.C. §78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

### THIRD CLAIM FOR RELIEF
**Defendant Vernier**
**(Aiding and Abetting Foley's Violation of**
**Exchange Act Section 10(b) and Rule 10b-5 thereunder)**

65.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 25 above.

66.     By allowing Foley to establish, fund, and place trades in Crocs securities through the Vernier Account, Vernier substantially assisted Foley's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

67.     When allowing Foley to establish, fund, and place trades in Crocs securities through the Vernier Account, Vernier knew of or recklessly disregarded Foley's breaches of duty to his then-employer, Deloitte and to its client, Crocs, including Foley's breach of Deloitte's restrictions against Foley's trading in Deloitte clients' securities, and of Deloitte's and Crocs' restrictions against trading on material, non-public information.

68.     The direct and reasonably foreseeable result of Vernier's allowing Foley to establish, fund, and place trades in Crocs securities through the Vernier Account, as Vernier knew or recklessly disregarded, was Foley's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

69.     By reason of the foregoing acts, practices, and transactions, defendant Vernier aided and abetted and caused Foley's violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF
### Defendant Foley
**(Direct and Aiding and Abetting Violation of Rule 2-02(b) of Regulation S-X, and Aiding and Abetting Violations of Exchange Act Section 13(a) and Rule 13a-13 thereunder)**

70.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 25 above.

71.     During a several-month period that included April and May of 2006, as a professional employee of Deloitte, Foley performed work, and billed time, in support of Deloitte's auditors' quarterly reviews of Crocs' financial statements at a time when Crocs was an audit client of the firm. As a result, Foley was a member Deloitte's Crocs audit engagement team and was, as such, proscribed both by the auditor independence rules and by Deloitte's auditor independence policies from having any direct investment in Crocs, including listed call options.

72.     At the time of his Crocs trading, Foley knew that he was a member of the Crocs audit engagement team, and further knew that, as a result, both pursuant to the auditor independence rules and Deloitte's policies, he was barred from trading in Crocs securities.

73.     Foley further knew that, if he traded in Crocs securities while serving as a member of Crocs' audit engagement team, Foley would, by that trading, cause Deloitte's independence as Crocs' auditor to be impaired, and would thereby also cause (i) Deloitte's Crocs audit work for

22

the relevant period not to be performed in accordance with the independence requirements of

Generally Accepted Auditing Standards ("GAAS"); and (ii) Crocs' SEC filing for the relevant

period to fail to include financial statements reviewed by an independent public accountant.

Notwithstanding this knowledge, Foley did trade in Crocs securities, thereby triggering both of

the foregoing outcomes.

  74. By reason of the foregoing acts, defendant Foley directly violated, and aided and

abetted and caused Deloitte's violation of, Rule 2-02(b) of Regulation S-X [17 C.F.R. § 210.2-

02(b)], and aided and abetted and caused Crocs' violations of Exchange Act Section 13(a) and

Rule 13a-13 thereunder [15 U.S.C. § 78m(a) and 17 C.F.R. § 240.13a-13].

## PRAYER FOR RELIEF

  WHEREFORE, the Commission respectfully requests that this Court:

## I.

  Grant a Final Judgment of Permanent Injunction restraining and enjoining each defendant

and their agents, servants, employees, attorneys-in-fact, and assigns and those persons in active

concert or participation with them, and each of them, from violating Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder;

## II.

  Grant a Final Judgment of Permanent Injunction restraining and enjoining Foley, Grassian

and Vernier and their agents, servants, employees, attorneys-in-fact, and assigns and those persons

in active concert or participation with them, and each of them, from violating Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 [17 C.F.R. § 240.14e-3] promulgated thereunder;

## III.

Grant a Final Judgment of Permanent Injunction restraining and enjoining Foley and his agents, servants, employees, attorneys-in-fact, and assigns and those persons in active concert or participation with them, and each of them, from violating Rule 2-02(b) of Regulation S-X [17 C.F.R. § 210.2-02(b)];

## IV.

Grant a Final Judgment of Permanent Injunction restraining and enjoining Foley and his agents, servants, employees, attorneys-in-fact, and assigns and those persons in active concert or participation with them, and each of them, from aiding and abetting and causing future violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-13 [17 C.F.R. § 240.13a-13] promulgated thereunder;

## V.

Order Foley, Hale, Grassian and Vernier to pay disgorgement of illegal trading profits flowing from their respective roles in connection with the trading in Crocs, Spectralink and SigmaTel securities set forth above, together with prejudgment interest thereon;

## VI.

Order defendants Foley, Grassian, Vernier and Hale to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

24

## VII.

Grant such other and further relief as this Court may deem just, equitable, and necessary.

Dated: *Feb. 25, 2010*

Respectfully submitted:

By: *[signature]*

Cheryl J. Scarboro (DC Bar # 422175)
C. Joshua Felker (DC Bar # 426154)
J. Lee Buck, II (DC Bar # 421878)
Kevin B. Muhlendorf (DC Bar # 469596)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-5030
Telephone: (202) 551-4960 (Felker)
Facsimile: (202) 772-9286
FelkerC@sec.gov

Attorneys for Plaintiff